[Cite as *State v. Scott*, 2022-Ohio-1669.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                                      No. 110691

    v.                                        :

OSBY C. SCOTT,                          :

    Defendant-Appellant.      :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 19, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-647428-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Anna Faraglia and Daniel Van, Assistant Prosecuting Attorneys, *for appellee.*

Michael P. Maloney, *for appellant.*

JAMES A. BROGAN, J.:

{¶ 1} Defendant-appellant Osby C. Scott ("Scott") appeals from his convictions and sentence for aggravated murder and other charges following a jury trial. For the reasons that follow, we affirm.

**Factual and Procedural History**

{¶ 2} On January 8, 2020, a Cuyahoga County Grand Jury indicted Scott on one count of aggravated murder in violation of R.C. 2903.01(A); one count of aggravated murder in violation of R.C. 2903.01(B); one count of aggravated burglary in violation of R.C. 2911.11(A)(2); one count of murder in violation of R.C. 2903.02(B); one count of felonious assault in violation of R.C. 2903.11(A)(1); one count of attempted aggravated murder in violation of R.C. 2923.02 and 2903.01(A); one count of felonious assault in violation of R.C. 2903.11(A)(2); one count of having weapons while under disability in violation of R.C. 2923.13(A)(2); one count of having weapons while under disability in violation of R.C. 2923.13(A)(3); and one count of cruelty to animals in violation of R.C. 959.131(C). With the exception of the having weapons while under disability and cruelty to animals charges, each count carried a one-year firearm specification, a three-year firearm specification, a repeat violent offender specification, and a notice of prior conviction specification.

{¶ 3} Scott initially pleaded not guilty to these charges. On September 2, 2020, Scott filed a pro se motion to waive counsel pursuant to Crim.R. 44(C). On September 24, 2020, Scott's counsel filed a motion to withdraw. On October 5, 2020, the court granted Scott's motion to proceed pro se, and Scott executed a waiver of his right to counsel. The court also granted Scott's counsel's motion to withdraw and appointed two attorneys to serve as Scott's standby counsel.

{¶ 4} On November 30, 2020, Scott filed a motion to suppress his statements made to detectives during an interrogation. On December 9, 2020, the

state filed a brief in opposition. The court held a hearing on Scott's motion to suppress on April 19, 2021, and Scott called two witnesses. The court denied Scott's motion to suppress. On May 5, 2021, Scott informed the court that he no longer wished to proceed pro se, and the court appointed Scott's standby counsel as his trial counsel. On May 17, 2021, the case proceeded to a jury trial on all but the having weapons while under disability charges and the repeat violent offender and notice of prior conviction specifications, which were tried to the bench.

{¶ 5} The charges in this case arose from events that took place around 11:00 p.m. on December 23, 2019. Scott shot and killed Dillard Carl Kennedy ("Kennedy"). He shot and wounded Kennedy's girlfriend Heather Crouthamel ("Crouthamel") and the couple's dog, Pork Chop ("Pork Chop").

{¶ 6} The state called Latania Deloach ("Deloach"), who testified that she had met Scott approximately four years earlier and was in a romantic relationship with him. Deloach testified that she and Scott had lived together for several years. Deloach also testified that she would let Scott use her phone, and she testified that her phone number was the number Crouthamel had associated with Scott. According to Deloach, she and Scott broke up in 2019, at which point they stopped living together. After breaking up, Deloach testified that she would still see Scott periodically, describing their relationship as "off and on." Deloach testified that at one point in late 2019, Scott bought her a white Chevrolet Blazer from Ray's Auto Connect on W. 150th Street in Cleveland, Ohio. Deloach went on to testify that on December 23, 2019, Scott came to her house to use her phone. At the time, Scott

was driving a green Chevrolet Tahoe. Deloach denied knowing Kennedy or Crouthamel and denied knowing anything about Kennedy's murder at the time. She testified that at some point in the days following December 23, 2019, she was contacted by police, who were looking for Scott, and that she subsequently learned that Scott was arrested.

{¶ 7} The state called Crouthamel, who testified that she and Kennedy began dating in approximately 2016 and moved to Cleveland from Tennessee in 2018. Kennedy worked for over 15 years as a lineman laying cable, and this work brought the couple to Cleveland. Crouthamel testified that the couple initially stayed in a hotel paid for by Kennedy's employer before moving into an apartment on the second floor of a three-family home located at 3411 W. 49th Street in Cleveland, Ohio.

{¶ 8} Crouthamel testified that she was previously addicted to drugs, and she and Kennedy both used heroin and methamphetamine. Crouthamel described Kennedy as a hard worker who went to work almost every single day and who also used drugs every day. Crouthamel was unemployed, and she testified that Kennedy's paycheck was deposited into her bank account and the couple shared money. Crouthamel testified that she met Scott after he was hired by Kennedy's employer. Crouthamel testified that Kennedy and Scott were friends and had a good relationship, and she testified that she and Scott were acquaintances and she had met Deloach as well. Crouthamel testified that Scott came to their apartment numerous times to hang out, sometimes bringing heroin, for which Kennedy would

pay him. Crouthamel described Scott's SUV and testified that he would usually park it in certain areas so that he could keep an eye on it from the couple's apartment because he stored drugs in his gas cap. Crouthamel also explained that sometimes Kennedy would get drugs from Scott on credit and would pay for them later. Crouthamel identified Scott at trial.

{¶ 9} Crouthamel testified that on December 23, 2019, Kennedy had recently returned from working out of state for several weeks. Earlier that day, Crouthamel had gone grocery shopping with a friend. She testified that she received a phone call from Scott at around 5 p.m., who told her that Kennedy owed him money and he wanted the money. According to Crouthamel, she informed Scott that Kennedy had not gotten paid yet and therefore was not able to pay him at that time. That night, she made dinner and watched a movie at home with Kennedy and Pork Chop.

{¶ 10} Crouthamel testified that around 11 p.m., while they were getting ready for bed, someone knocked at their front door. Crouthamel and Kennedy, both in pajamas, went to the door and asked who was there. The person at the door responded that it was No-No, which is another name Scott went by. They opened the door, and Crouthamel testified that she recognized Scott. Crouthamel testified that Pork Chop was jumping, so she went with him to the bedroom and closed the door. According to Crouthamel, she heard Kennedy and Scott arguing and she heard Scott asking Kennedy for $200. She went on to testify that Kennedy said that he did not have the money and told Scott that he could ask their employer to verify that

Kennedy had not been paid yet. Crouthamel described the conversation she heard through the bedroom as initially just talking that escalated to a heated conversation, causing her to think there might be a physical altercation. Crouthamel then testified that she heard a gunshot and froze. She went on to testify that Scott kicked and then opened the bedroom door, pointed a gun at her, and shot her. Crouthamel testified that Scott did not say anything to her and he left after shooting at her. By that time, Kennedy had leaned in towards the bedroom and told Crouthamel to call 911. Crouthamel explained that she had a prepaid phone, but at the time, it did not have any minutes on it so she could receive calls but was unable to make an outgoing call.

{¶ 11} Crouthamel left the apartment and knocked on their downstairs neighbor's door but got no response, so she went to another neighbor, Kevin Newsome's ("Newsome") house across the street and used Newsome's phone to call 911. Crouthamel then returned to her apartment, where Kennedy was laying on the living room floor. She testified that she told Kennedy that an ambulance was coming and that he would be okay. According to Crouthamel, Kennedy was able to talk and told her that he was dying and that he loved her. Shortly thereafter, police and EMS arrived at the apartment. Crouthamel testified that before she was transported to the hospital, a police officer questioned her and she provided him with Scott's name, phone number, physical description, and a photo of Scott. Crouthamel reiterated that she was sure that the individual in the apartment was Scott and that no one else was in the apartment other than Scott, Kennedy, and herself. Crouthamel testified that she had not used any drugs on December 23, 2019. She also testified that

Kennedy had used drugs that day but she could not say exactly when. Finally, Crouthamel testified that after Kennedy's death, Kennedy's brother came and brought her and Pork Chop back to Tennessee.

{¶ 12} The state called Newsome as a witness. Newsome testified that he lived across the street from Crouthamel. Newsome testified that he knew Crouthamel because she would sometimes hang out on the front porch with Newsome's upstairs neighbor but he did not have a personal relationship with Crouthamel. He went on to testify that on December 23, 2019, Crouthamel showed up on his front porch, banged on the door and stated that her boyfriend and her dog had been shot and asked to use Newsome's phone to call 911. According to Newsome, Crouthamel used his phone to call 911 and was on the phone for several minutes on his front porch. Shortly thereafter, police arrived on the scene, and Newsome testified that he spoke with them briefly, explained what happened as far as he knew, and gave the police a blanket for Pork Chop.

{¶ 13} The state called Cleveland police officer Ryan Sowders ("Officer Sowders"), who responded to a call that two people were shot at a home located at 3411 W. 49th Street in Cleveland, Ohio. EMS were at the scene when Officer Sowders arrived. Upon arriving at the scene, Officer Sowders worked with EMS to identify the victims, Kennedy, Crouthamel, and Pork Chop, all of whom had been shot. Kennedy was conscious but appeared to be in critical condition, and Crouthamel appeared to have a minor gunshot wound. Officer Sowders testified that Crouthamel provided him with the name, physical description, phone number,

and vehicle description for a suspect. Crouthamel also informed Officer Sowders that Kennedy and Scott were coworkers. Officer Sowders transported Pork Chop to a veterinary hospital to be treated for a gunshot wound. Officer Sowders then returned to the scene, where he learned that Kennedy had died.

{¶ 14} Two separate ambulances responded to the scene on December 23, 2019. The state called a paramedic from each of the responding EMS teams. Kimberly Florczyk ("Florczyk") testified that she and her partner responded to the scene on December 23, 2019, and found Kennedy on the floor of his apartment, with a gunshot wound to the chest, stating that he was unable to breathe. Florczyk described applying a chest seal to Kennedy's wound, removing him from the apartment, and placing him in an ambulance. Florczyk testified that in the ambulance, Kennedy became unresponsive, no longer had a pulse, and ceased breathing on his own. Florczyk testified that her partner performed CPR and continued to perform airway management until Kennedy was transferred to the hospital.

{¶ 15} Paul Wojtkiewicz ("Wojtkiewicz") testified that because he and his partner responded shortly after Florczyk, he took care of Crouthamel, the less critical patient. He testified that they bandaged two gunshot wounds in Crouthamel's lower right leg, stabilized her, and then transported her to the hospital. Wojtkiewicz also testified that Crouthamel was alert and oriented and was very concerned about Kennedy and Pork Chop.

{¶ 16} Cleveland police officer Molly Madaras ("Officer Madaras"), another responding officer, testified that she arrived at the scene after Officer Sowders and rode in the ambulance with Kennedy. Upon arriving at the hospital, Officer Madaras located Crouthamel in the emergency department, where she was being treated for a gunshot wound to her leg. Officer Madaras spent several hours with Crouthamel, who provided Officer Madaras with information about the suspect. Officer Madaras testified that she asked Crouthamel if she had a picture of the suspect, who Crouthamel had identified as Scott, also known as No-No. Crouthamel took out a phone and showed Officer Madaras a picture of Scott with Pork Chop. Crouthamel also provided Officer Madaras with a phone number for Scott, which Officer Madaras subsequently provided to the homicide detectives assigned to the case. Crouthamel told Officer Madaras that Scott and Kennedy had worked together for six to eight months and Scott had come over that night for money.

{¶ 17} Upon Crouthamel's release from the hospital, Officer Madaras transported her to the homicide unit, where detectives interviewed her. After the interview, Officer Madaras transported Crouthamel to her house to pick up personal belongings and then drove her to a friend's house.

{¶ 18} Kimberly Parker-Schuler ("Parker-Schuler"), an emergency veterinarian at West Park Animal Hospital, testified that Pork Chop was brought in by police and was limping and not putting any weight on his left front leg. Parker-Schuler testified that Pork Chop was sedated so that they could take radiographs and further evaluate the injuries. She testified that the x-ray images showed broken toes

and metal fragments consistent with a bullet injury. She further testified that Pork Chop's wounds were cleaned, bandaged, and splinted, and the dog was given pain medication and antibiotics and ultimately released to Crouthamel.

{¶ 19} Cleveland Police detective Mark Peoples ("Detective Peoples") testified that he arrived at the scene and took photos for the homicide unit. Detective Peoples identified and photographed a spent shell casing on the living room floor. Detective Peoples testified that after he photographed the crime scene, he went to the hospital and photographed Crouthamel, her injuries, and the photo she had on her phone of Scott and Pork Chop.

{¶ 20} Cleveland Police detective Stephen Loomis ("Detective Loomis") testified that he responded to the scene on December 23, 2019. Detective Loomis testified that when he arrived at the scene, Crouthamel and Kennedy had already been transported to the hospital but, based on notes from the first responders to the scene, he had a good idea of what Crouthamel had told police. He testified that he looked for defects in the walls that may have been caused by bullets and did not find any defects. He also testified that one shell casing was located in the living room and another shell casing was located in the bedroom. Detective Loomis also testified that the bedroom door was damaged and looked like it had been kicked. Detective Loomis testified that after inspecting the apartment, he canvassed the area around the home and the neighborhood and identified two neighbors who had relevant surveillance footage, Michael Hafey ("Hafey") and Miguel Santiago ("Santiago").

{¶ 21} The state called Santiago, who lived next door to Crouthamel and Kennedy at 3409 W. 49th Street, and testified that he had a home surveillance system. Santiago testified that detectives woke him up on December 23, 2019, to ask him to see his footage from his surveillance system. This footage was played at trial.[1] The footage showed a man passing in front of Santiago's house and heading towards Crouthamel's house. Santiago testified that he did not know this man and it was not one of his neighbors. The footage also showed a woman, appearing to be Crouthamel, leave her house and run across the street to her neighbor's house to call 911.

{¶ 22} Santiago's surveillance footage showed a man appear to head towards Crouthamel's house, but the footage did not show the same man return. Detective Loomis testified that based on this surveillance footage, the story relayed to him by Crouthamel, and the location of Crouthamel's house, "the only obvious direction" the suspect could have gone after leaving Crouthamel's house would have been to cut through Crouthamel's backyard towards W. 47th Street. A canvass of that neighborhood resulted in identifying Hafey, who lived at 3416 W. 47th Street. Detective Loomis testified that if one walked directly east from the back of Crouthamel's house, they could walk through an empty, unfenced lot to W. 47th Street.

---

[1] Santiago testified that while he showed detectives the footage on December 23, 2019, he did not provide them with a copy of the footage. Detective Loomis took a cell phone recording of the footage on December 23, 2019; this recording of Santiago's surveillance footage is what was introduced at trial.

{¶ 23} Hafey testified that he lives at 3416 W. 47th Street in Cleveland, Ohio, and that he has a home surveillance system that records his front porch and the sidewalk in front of his house. Hafey testified that he usually returned home from work shortly after 11 p.m., at which point he would take his dog outside. Hafey testified that on December 23, 2019, just as he was taking his dog outside, his dog ran down his front steps and started barking at a man. Hafey testified that he apologized to the man, who at that point was running past Hafey's house, explaining that he would not have let the dog out of the house if he had seen the man there. According to Hafey, the man did not respond to his apology but, as the man was running past the house, he heard the dog barking behind him and turned around and pointed at the dog. Hafey testified that the man then crossed the apron of Hafey's driveway into the street and got into the driver's seat of a car several houses away and drove off.

{¶ 24} Hafey provided his surveillance footage to Detective Loomis, and the state introduced the footage at trial. The video, timestamped 11:27 p.m. on December 23, 2019, shows Hafey, his dog, and a man passing Hafey's house as described in Hafey's testimony. Hafey testified that the man was not one of his neighbors and he did not know the man.

{¶ 25} Additional canvassing of the neighborhood resulted in surveillance footage from earlier in the evening from nearby businesses showing a man who appeared to be wearing the same clothes as the suspect in the aforementioned footage walking north on W. 47th Street towards Storer Avenue, west on Storer

Avenue, and south on W. 49th Street towards Crouthamel's house. Following this canvassing of the neighborhood, Detective Loomis testified that he went to the hospital to speak with Crouthamel, who provided him with information about Scott, including his phone number.

{¶ 26} Detective Loomis testified that upon learning that the phone number Crouthamel provided belonged to Deloach, he contacted Deloach and asked her a series of questions about Scott. Detective Loomis also described going to Deloach's home, as well as going to various separate addresses that he believed were associated with various relatives of Scott. Detective Loomis testified that his investigation ultimately led to Ray's Auto Connect, a used car lot on W. 150th Street. Detective Loomis located Scott in the backseat of a vehicle in the parking lot of Ray's Auto Connect and arrested him. Detective Loomis testified that he and another detective subsequently interviewed Scott, and the state introduced the recorded interview at trial. In this interview, Scott admitted that he went to the house to get his money from Kennedy, but he denied having a gun.

{¶ 27} Edward Lattyak ("Lattyak"), the firearms sections supervisor at the Cuyahoga County Regional Forensic Scientific Laboratory, testified that based on his analysis of the bullet that was recovered during Kennedy's autopsy, it was a 32-caliber bullet that had been fired and was significantly damaged. He also testified that the shell casings recovered from the scene possibly came from the same gun, and both were 32-caliber cartridge cases. Lattyak further testified that the

ammunition involved in this case is most commonly used in a semiautomatic firearm.

{¶ 28} Dr. Erica Armstrong ("Dr. Armstrong"), a forensic pathologist from the Cuyahoga County Medical Examiner's Office, testified that she performed an autopsy of Kennedy and prepared a corresponding report. Dr. Armstrong testified that Kennedy had a gunshot wound to the right chest, as well as a number of small scabs around his chin area and along his forearms indicative of chronic intravenous drug use. Dr. Armstrong explained that the path of the bullet grazed one of Kennedy's ribs, perforated his diaphragm, went into the right side of his liver, and went through his aorta. Dr. Armstrong testified that she recovered the bullet, and as a result of his internal injuries, approximately three liters of blood accumulated inside Kennedy's abdominal cavity. Dr. Armstrong also testified that Kennedy had nicotine, morphine, methamphetamine, fentanyl, and carfentanil in his system, but these were not the cause of death. Finally, Dr. Armstrong testified that she concluded that Kennedy's cause of death was a gunshot wound with visceral, vascular, skeletal, and soft tissue injuries, and the manner of his death was classified as a homicide.

{¶ 29} Finally, the state introduced audio of jail calls made by Scott in which he referenced the incident in this case.

{¶ 30} At the close of the state's case, Scott's counsel made a Crim.R. 29 motion for acquittal. The court denied this motion. Scott did not call any witnesses

or introduce evidence on his behalf. Defense counsel renewed the Crim.R. 29 motion, which the court denied.

{¶ 31} On May 17, 2021, the jury found Scott guilty of all charges except cruelty to animals. The same day, the court found Scott guilty of both counts of having weapons while under disability and each of the repeat violent offender and notice of prior conviction specifications.

{¶ 32} On June 28, 2021, the court held a sentencing hearing. The parties and the court agreed that various offenses would merge for sentencing such that the court would sentence Scott on one count of aggravated murder and the corresponding firearm specifications, one count of attempted aggravated murder and the corresponding firearm specifications, and one count of having weapons while under disability.

{¶ 33} Kennedy's sister and Crouthamel both addressed the court and asked the court to impose a maximum sentence. The assistant prosecuting attorney addressed the court and requested consecutive sentences. Finally, defense counsel addressed the court and requested a 26-year sentence for Scott. Defense counsel also objected to the application of the Reagan Tokes Law. The court sentenced Scott to a life imprisonment with parole eligibility after 31 years.

{¶ 34} Scott appeals, presenting two assignments of error for our review:

I. The trial court erred in denying appellant's Crim.R. 29 motion for acquittal when there was insufficient evidence to prove count one of the indictment, aggravated murder.

II. The indefinite sentence imposed upon appellant under the Ohio Reagan Tokes Act was unconstitutional, imposed in violation of the separation-of-powers doctrine.

## Legal Analysis

### I. Sufficiency of the Evidence

{¶ 35} In his first assignment of error, Scott argues that the court improperly denied his Crim.R. 29 motion because the state did not present sufficient evidence that he committed aggravated murder. Specifically, Scott argues that the state failed to present evidence that he acted with prior calculation and design.

{¶ 36} Crim.R. 29(A) provides that a court

"shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Because a Crim.R. 29 motion questions the sufficiency of the evidence, "[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence."

*Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 37} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259,

273, 574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 38} Scott was convicted of two counts of aggravated murder. Relevant to this appeal, Scott was convicted of one count of aggravated murder in violation of R.C. 2903.01(A). Pursuant to R.C. 2903.01(A), the state was required to prove that Scott "purposely, and with prior calculation and design, [caused] the death of another." Purpose to kill is not the same thing as prior calculation and design and does not by itself satisfy the mens rea element of R.C. 2903.01(A). *State v. Walker*, 150 Ohio St.3d 409, 413, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 17. R.C. 2903.01(A) "employs the phrase 'prior calculation and design' to indicate an act of studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim." *Id.*, citing Ohio Legislative Commission, *Proposed Ohio Criminal Code: Final Report of the Technical Committee to Study Ohio Criminal Laws and Procedures*, at 71 (1971).

{¶ 39} Three main factors are considered in determining whether a defendant acted with prior calculation and design:

> "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'"

*State v. Keith*, 2017-Ohio-1545, 90 N.E.3d 136, ¶ 30 (8th Dist.), quoting *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, quoting *State v.*

*Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

{¶ 40} Here, the state presented evidence that Kennedy and Scott knew each other; Scott was a coworker, friend, and drug dealer to Kennedy. The state also presented evidence that their relationship was strained because Kennedy owed Scott money. The state also presented evidence that Scott called Crouthamel about this debt at around 5 p.m. and then, approximately six hours later, showed up at Kennedy's home to demand payment. The state also presented evidence that Scott parked one street over from the home. Finally, the state presented evidence that after unsuccessfully attempting to collect his debt from Kennedy, Scott showed up at Kennedy's home, where the two men had a conversation that eventually escalated into a heated argument, before Scott ultimately shot Kennedy in the chest.

{¶ 41} Viewing this evidence in the light most favorable to the state, any rational trier of fact could have found that Scott acted with prior calculation and design, satisfying the elements of R.C. 2903.01(A). Therefore, the trial court properly denied Scott's Crim.R. 29 motion. Scott's first assignment of error is overruled.

**II. Reagan Tokes Law**

{¶ 42} In his second assignment of error, Scott argues that his sentence is invalid because it was imposed pursuant to Reagan Tokes, which violates the Ohio and United States Constitutions. Specifically, Scott argues that the law violates his due process rights and violates the separation-of-powers doctrine. Scott's

arguments are overruled pursuant to this court's en banc decision in *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470, which overruled the challenges presented in this appeal to the Reagan Tokes Law enacted through S.B. 201. Therefore, we find that Scott's sentence pursuant to Reagan Tokes was not a violation of his constitutional rights. Scott's second assignment of error is overruled.

{¶ 43} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
JAMES A. BROGAN, JUDGE*

EILEEN A. GALLAGHER, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR

(*Sitting by assignment: James A. Brogan, J., retired, of the Second District Court of Appeals.)