[Cite as *State v. Heard*, 2022-Ohio-2266.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                      :

    Plaintiff-Appellee,        :

                                        No. 110722

    v.                                  :

JARON HEARD,                        :

    Defendant-Appellant.       :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 30, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-649186-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michael Timms, Assistant Prosecuting Attorney, *for appellee*.

Joseph V. Pagano, *for appellant*.

EMANUELLA D. GROVES, J.:

{¶ 1} Defendant-appellant, Jaron Heard ("Heard"), appeals his convictions following a jury trial. For the reasons set forth below, we affirm.

## Procedural and Factual History

{¶ 2} On the night of New Year's Eve, 2019, the Medusa Night Club ("Medusa" or the "nightclub") on St. Clair Avenue was packed with about 500 patrons, who were there for a performance of Chief Keef. Shortly before 1 a.m., gunshots erupted around the dance floor, resulting in injuries to four patrons. Following an investigation by the Cleveland Police Department ("CPD"), police officers arrested Heard, without incident, on February 29, 2020, at the former Prime XO Steakhouse.

{¶ 3} On March 11, 2020, a grand jury returned a ten-count indictment including four counts of felonious assault in violation of R.C. 2903.11(A)(1), four counts of felonious assault in violation of R.C. 2903.11(A)(2),[1] one count each of having weapons while under disability ("HWWUD") in violation of R.C. 2923.13(A)(2),[2] and carrying a concealed weapon in violation of R.C. 2923.12(A)(2).[3] On March 16, 2020, Heard pled not guilty at his arraignment and over the ensuing months, numerous pretrials were conducted.

{¶ 4} On October 26, 2020, Heard filed a motion in limine requesting that the trial court exclude the testimony of his parole officer, who identified him in footage from the nightclub's surveillance video. The state objected and, on

---

[1] Each of Counts 1-8 carried one-year, three-years, and 54-months firearms specifications, as well as a notice of prior conviction, and a repeat violent offender specification.

[2] One-year, three-years, and 54-months firearms specifications were attached.

[3] Forfeiture specification attached.

November 16, 2020, the trial court held a hearing on the motion. On December 16, 2020, the trial granted Heard's motion. The state appealed the trial court's decision, but dismissed the appeal on February 25, 2021, based on new evidence.

{¶ 5} On March 29, 2021, Heard filed a motion to suppress a witness' identification, which the state objected. On April 14, 2021, the trial court held a hearing on the motion. The trial court denied the motion. Subsequently, on April 28, 2021, Heard elected to have the charge of HWWUD, the notice of prior conviction specification, the repeat violent offender specification, and the 54-months firearm specification attached to Counts 1-9 tried to the bench. Heard had a jury trial on the remaining counts.

{¶ 6} At trial, the state presented 12 witnesses,[4] including Andrea Dukes ("Dukes"), who testified that she was a patron of the nightclub that night and was struck in the foot during the shooting. Dukes was taken to the hospital where she discovered she had suffered a broken bone in her foot. Dukes testified that the scene was chaotic and that she did not see who shot her.

{¶ 7} CPD detective Ron Berry ("Detective Berry") testified that he and fellow officers responded to the scene moments after the shooting and found the situation chaotic. Detective Berry testified that officers attempted to interview possible witnesses, but none wanted to speak with them about what they might have observed. Detective Berry spoke with Medusa's general manager, Bryan McIntosh

---

[4] The testimony of some witnesses will be set forth in the law and analysis section below.

("McIntosh"), who gave Detective Berry access to the footage from the nightclub's various surveillance cameras. Detective Berry was able to view approximately 90 minutes of video footage, parts of which included the shooting.

{¶ 8} At the trial, the state played the surveillance video, comprised of four segments, taken from different angles. Three video segments were in black and white, while the fourth was in technicolor. Detective Berry narrated as different portions were being showed. The first portion of footage, presented in black and white and taken by camera five, located overhead in the VIP section of the nightclub, depicted the shooter firing into the crowd. The shooter retreated backwards, while actively shooting, and bumped into the stage and nearly fell. The shooter dropped the weapon before putting it back into his pocket. Detective Berry pointed out that the video showed the back of the shooter's sweatshirt, which was emblazoned with a large X. Little stripes were also visible on the designer work of the hoodie.

{¶ 9} Another portion of the video, presented in black and white and taken by camera six, showed patrons on the dance floor and depicted a brief scuffle between two women. Detective Berry noted that gunshots could be heard coming from the foreground, causing patrons to scatter towards the exit. Detective Berry described how the patrons stepped on top of each other and dropped personal belongings while fleeing.

{¶ 10} The third portion of the video, presented in black and white and taken by camera eight, showed the male wearing the sweatshirt with the large X on the back of the garment, grabbing and pulling another male before reaching down and

drawing a gun. Detective Berry explained how the male with the large X on the back of his sweatshirt pointed the weapon in the down position before firing erratically into the crowd. Detective Berry remarked that the individual wearing the hoodie with the large X on the back and little stripes on the design was the only person captured on the surveillance cameras shooting inside of the nightclub.

{¶ 11} The fourth portion of the video, presented in technicolor and taken by camera three, showed patrons entering the building, including a male in a green sweatshirt. The face of the male in the green sweatshirt was clearly visible. Detective Berry underscored that the male entering the nightclub was wearing the same sweatshirt as the shooter depicted in the other footages. Detective Berry specifically pointed towards the large X imprinted on the back and the little stripes on the side of the green sweatshirt. Detective Berry asserted that he saw no one else on the surveillance footage with the same distinctive patterns on their clothing. Detective Berry testified that this was the individual seen in the earlier portion of the video who had fired into the crowd.

{¶ 12} Alphonso Lewis ("Lewis"), another patron in attendance, testified that he arrived at the club around 11:30 p.m., with Jonna Farrell ("Farrell") and two other companions. Lewis described witnessing a fight between two patrons that started in the VIP section of the nightclub. Lewis explained that once the nightclub lights were turned on, the two patrons were brought down to the floor and separated into a party on the right and a party on the left of the dance floor. Lewis stated that after the parties were separated, the lights were again turned off.

{¶ 13} Lewis testified that moments later, the party from the left side of the dance floor started shooting towards the right side of the dance floor. To protect Farrell as shots were being fired, Lewis tackled her to the ground of the dance floor and laid atop Farrell, until the gunshots ceased. Lewis testified that he did not see the person who had been firing the gun, but that he, Farrell, and his two companions exited the nightclub through a door into the back alley.

{¶ 14} Lewis further testified that once he was outside and expressing anger about the money he had spent at the club, he turned around to say something to his friends when someone shot him in the face. Lewis testified that he did not see the shooter's face, so he was unsure if the person who shot him was the same person that had been shooting inside the nightclub. After he was shot, Lewis immediately ran and became separated from his friends, but found police officers, whom he briefly spoke with before being transported to MetroHealth Medical Center.

{¶ 15} Farrell testified that she and Lewis were on the dance floor for about 35-to-40 minutes before the shooting started. Farrell stated that Lewis pushed her to the ground, laid on top of her during the shooting, and that they later exited the nightclub through a door into a back alley. Farrell stated that Lewis was mad about the shooting because he had spent so much money to get into the nightclub. Farrell testified that at one point, Lewis said something out loud, at which time, an individual whom Farrell claimed was the person that had been shooting in the nightclub, turned around and said, "Oh, what you said? What you say?" and opened fire. Farrell stated that Lewis pushed her out of the way, causing her to fall.

{¶ 16} Farrell testified that, while her friends had fled, "the shooter, he sat there with his arm out and he was — he still had the gun on me. I didn't know what to expect. I couldn't take my eyes off of him. I'll never forget his face. And he just walked away. He just turned around and walked away." Farrell testified she later found Lewis and her companions with police at the corner.

{¶ 17} Farrell testified that Detective Berry contacted her in January 2021, and that she later identified Heard as the person that shot Lewis outside the nightclub. Farrell acknowledged that she knew the name of the person who had been arrested before she went in to make an identification. Farrell testified that the shooter was wearing a salmon or light pink sweatshirt and that the shooter was a male with baby dreadlocks. Farrell claimed that Lewis knew she had seen the shooter, because they had spoken about the case a lot.

{¶ 18} At the close of the state's case-in-chief, the trial court granted Heard's motion for acquittal on Counts 3, 4, 7, and 8. Heard did not present a case and rested. The jury found Heard guilty of Counts 2 and 6, felonious assault charges relating to Dukes, with one-year and three-year firearm specifications, as well as guilty of Count 10, carrying a concealed weapon. The jury found Heard not guilty of Counts 1 and 5, felonious assault charges relating to Lewis. Separately, the trial court found Heard guilty of Count 9, HWWUD, the 54-month firearm specifications, the repeat violent offender specification, and the notice of prior conviction.

{¶ 19} On May 12, 2021, the trial court reopened the case and indicated that it had erroneously believed there was a stipulation to the bifurcated counts relating

to prior convictions. The trial court allowed the state to present an additional witness, whose testimony will be discussed below in the third assignment of error. Thereafter, the trial court found Heard guilty of Count 9, having weapons while under disability, the 54-month firearm specifications, the repeat violent offender specification, and the notice of prior conviction.

{¶ 20} On July 8, 2021, Heard appeared for sentencing. The trial court imposed a prison sentence of four years on Count 2 — felonious assault, which had to be served consecutive to the four and half years on the attendant firearm specification. The trial court also imposed a prison sentence of one year on Count 9 — HWWUD, which would be served concurrently to the base term in Count 2. The trial court ordered Heard to serve the four and a half years firearm specification, attendant Count 9, consecutively to the firearm specification attached to Count 2. The trial court did not impose a prison sentence on Count 6, because of the merger with Count 2. The trial court imposed an aggregate sentence of 13 years.

{¶ 21} Additionally, the trial court advised Heard that the Reagan Tokes Act would be applied to the four-year sentence on Count 2, felonious assault, and explained the presumptive release date, pursuant to R.C. 2967.271(B), and that it could be rebutted by the Ohio Department of Rehabilitation and Correction ("ODRC"). The trial court further advised that if the ODRC rebuts the presumption, Heard's sentence may be extended for up to two years, pursuant to R.C. 2967.271(C), for a period that does not exceed the maximum prison term imposed.

{¶ 22} Heard now appeals and assigns the following errors for review:

## Assignment of Error No. 1

Appellant was denied due process when the trial court denied the motion to suppress identification testimony and did not instruct the jury pursuant to R.C. 2933.83(C).

## Assignment of Error No. 2

The court erred by admitting video evidence and testimony that was not properly authenticated and without establishing a proper chain of custody.

## Assignment of Error No. 3

The trial court abused its discretion and violated Appellant's constitutional rights against double jeopardy by allowing the State to re-open its case after the court had rendered its verdict based on insufficient evidence.

## Assignment of Error No. 4

The trial court erred when it denied Appellant's motion for acquittal under Crim. R. 29 because the State failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

## Assignment of Error No. 5

Appellant's convictions are against the manifest weight of the evidence.

## Assignment of Error No. 6

Appellant was denied a fair trial when the court overruled objections to improper statements made during closing arguments regarding non-testifying witnesses in violation of Appellant's constitutional rights.

## Assignment of Error No. 7

Appellant's sentence is invalid because it was imposed pursuant to the Reagan Tokes Act Amendments, S.B. 201, which violates the United States and Ohio Constitutions.

## Assignment of Error No. 8

Appellant received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution for not raising a constitutional challenge to the application of the Reagan Tokes Law.

## Law and Analysis

### Suppression of Identification Testimony / Mootness

{¶ 23} In the first assignment of error, Heard argues that he was denied due process when the trial court denied the motion to suppress Farrell's identification testimony and by not instructing the jury pursuant to R.C. 2933.83(C).

{¶ 24} Generally, courts will not resolve issues that are moot. *State v. Baird*, 8th Dist. Cuyahoga No. 108515, 2020-Ohio-2717, ¶ 6, citing *State v. Marcum*, 2015-Ohio-5237, 54 N.E.3d 719, ¶ 6 (10th Dist.), citing *In re L.W.*, 168 Ohio App.3d 613, 2006-Ohio-644, 861 N.E.2d 546, ¶ 11 (10th Dist.).  An [issue] will be deemed moot if the appellant seeks to obtain a "judgment upon some matter which, when rendered, for any reason cannot have any practical legal effect upon a then-existing controversy." *Id.*, citing *In re L.W.*

{¶ 25} The sole issue within this assignment of error is Heard's claim that the trial court should have suppressed Farrell's identification testimony.  In this matter, Farrell's testimony was totally related to the allegation that Heard was the individual that shot Lewis.  However, as noted above, the jury acquitted Heard of all the charges relating to Lewis.  Thus, addressing whether the trial court should have suppressed Farrell's identification testimony serves no practical purpose at this juncture. Consequently, the issue Heard now raises is moot.

{¶ 26} As the state aptly points out, issues are moot, "'when they are or have become fictitious, colorable, hypothetical, academic or dead. The distinguishing characteristic of such issues is that they involve no actual genuine, live controversy, the decision of which can definitely affect existing legal relations.'" *Sunderland v. Liberty Twp. Bd. of Zoning Appeals*, 5th Dist. Delaware No. 20 CAH 06 0023, 2021-Ohio-353, ¶ 16, citing *Grove City v. Clark*, 10th Dist. Franklin No. 01AP-1369, 2002-Ohio-4549, ¶ 11, quoting *Culver v. Warren*, 84 Ohio App. 373, 393, 83 N.E.2d 82 (11th Dist.1948).

{¶ 27} Accordingly, we overrule the first assignment of error.

**Admission of Video Evidence**

{¶ 28} In the second assignment of error, Heard argues that the trial court erred in admitting video evidence and testimony, because it was not properly authenticated. Alternatively, Heard argues the chain of custody was not properly established.

{¶ 29} Preliminarily, the admission of evidence is within the trial court's sound discretion. *Cleveland v. Greear*, 8th Dist. Cuyahoga No. 108190, 2020-Ohio-29, ¶ 19, citing *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). A trial court will have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *Id.*, citing *State v. Taylor*, 8th Dist. Cuyahoga No. 98107, 2012-Ohio-5421, ¶ 22, citing *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 16-18 (2d Dist.). In addition, the trial court's abuse of its discretion must have materially prejudiced the defendant.

*Id.*, citing *State v. Lowe*, 69 Ohio St.3d 527, 532, 634 N.E.2d 616 (1994), citing *State v. Maurer*, 15 Ohio St.3d 239, 265, 473 N.E.2d 768 (1984).

{¶ 30} Pertinent to this matter, is Evid.R. 901, which provides for the authentication or identification of evidence prior to its admissibility. In part, it states that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A).

{¶ 31} Additionally, "the authentication requirement of Evid.R. 901(A) is a low threshold that does not require conclusive proof of authenticity, but only sufficient foundation evidence for the trier of fact to conclude that the evidence is what its proponent claims it to be." *State v. Toudle*, 8th Dist. Cuyahoga No. 98609, 2013-Ohio-1548, ¶ 21, citing *Yasinow v. Yasinow*, 8th Dist. Cuyahoga No. 86467, 2006-Ohio-1355, ¶ 81.

{¶ 32} Further,

> [t]he admissibility of photographic evidence is based on two different theories. One theory is the "pictorial testimony" theory. Under this theory, the photographic evidence is merely illustrative of a witness' testimony and it only becomes admissible when a sponsoring witness can testify that it is a fair and accurate representation of the subject matter, based on that witness' personal observation. * * * A second theory under which photographic evidence may be admissible is the "silent witness" theory. Under that theory, the photographic evidence is a "silent witness" which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness.

*Cleveland v. Alrefaei*, 2020-Ohio-5009, 161 N.E.3d 53, ¶ 28 (8th Dist.), citing *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 150, quoting

*Midland Steel Prods. Co. v. Internatl. Union, United Auto., Aerospace & Agriculture Implement Workers, Local 486*, 61 Ohio St.3d 121, 129-130, 573 N.E.2d 98 (1991).

{¶ 33} Within the second assignment of error, Heard claims that the only witnesses that testified relative to the collection of the video footage, Detective Berry and McIntosh, provided contradicting testimony. Specifically, Heard claims that the evidence was not properly authenticated because the owner of the nightclub, who could have altered the video when it was in his sole possession, did not testify. We are not persuaded by these assertions.

{¶ 34} We begin with McIntosh, who testified that the nightclub opened in 2017 and had a security surveillance system that was upgraded between 2018 and 2019. McIntosh testified that in his capacity as the general manager, he regularly worked with the security system. McIntosh stated that he viewed the video footage with the police after the shooting and that the video footage was an accurate representation of what was contained on the nightclub's security cameras. While the video was being played, McIntosh explained what each camera was depicting.

{¶ 35} On cross-examination, the following exchange took place:

Q. The night of the incident, did you actually create the burned copy of the video for the Cleveland Police or did somebody else do that?

A. It was a joint effort between me and Mr. Magali. We basically took the USB drive, made a copy and gave it to Cleveland PD.

Q. Did you include all video cameras that were available and provide those to the Cleveland police?

A. I believe so, yes.

Q. Or did you just provide edited versions?

A. No, we gave them the whole — the whole relay of the night.

Q. So there would be more cameras than this, is what you're saying?

A. I believe so. There should be.

\* \* \*

Q. And again, were you personally the person that burned or made the copy, that did the work to transfer it from your surveillance system to the thumb drive that was provided to Cleveland Police?

A. It was a joint — I'd say me and Mr. Magali.

Q. Who actually did it? Because only one person can do it.

A. I believe Mr. Magali.

{¶ 36} Here, considering the low threshold of authentication, we find that McIntosh's testimony properly authenticated the video. McIntosh was present at the nightclub on the night of the shooting and viewed, alongside the police, what the surveillance camera captured. In addition, McIntosh affirmed that the video footage introduced accurately represented what had been captured on the surveillance cameras.

{¶ 37} Further, McIntosh testified that the creation of the copy that was provided to law enforcement was a joint effort between himself and the owner of the nightclub. Whether McIntosh or the nightclub's owner physically inserted the thumb drive into the computer to transfer the footage is immaterial since, as defense counsel stated: "only one person can do it." McIntosh's testimony, viewed in the proper and practical context, simply represents their joint efforts in providing law

enforcement with a copy of what was captured on the surveillance cameras. As such, it does not render the video footage unauthentic.

{¶ 38} Nonetheless, Heard claims the two witnesses provided contradictory testimony. A non-isolative review of Detective Berry's testimony reveals the opposite. Detective Berry testified that "[a]t that time I viewed a lot of the video [at the nightclub] approximately an hour, hour and a half worth of video. And the inside shooting was captured on the video inside of the nightclub." Immediately, and arguably apparent, not everything that the surveillance camera captured, in the approximately 90 minutes of footage Detective Berry reviewed, would have been relevant to the police investigation of the shooting.

{¶ 39} Our review of the video contained on the thumb drive admitted into evidence reveals that the longest of the four segments was only 3:13 minutes long. That segment captured by camera three, depicts patrons, including Heard, entering the nightclub. The other three segments captured on cameras five, six, and eight depict different angles of the shooting inside the nightclub. These three segments were only 59 seconds each.

{¶ 40} Detective Berry continued that

[a]t that time, I asked [McIntosh] could I take sections out of it, because it was a lot of just the nightclub where it was too dark for you to see. But after the shooting, I believe some house lights came up a little bit and we could see individuals there. So I was able to, myself, have him edit out what I didn't want and I took the part of the video that I need.

{¶ 41} Finally, Detective Berry affirmed that the video segments that had been played represented the footage he received from the nightclub. Critically,

Detective Berry testified that these segments contained the clearer photographs that actually showed what he was looking to obtain. Thus, notwithstanding Heard's assertions, Detective Berry's testimony, in conjunction with McIntosh's, served to establish that the video footage accurately represented what transpired on the night of the shooting.

{¶ 42} Moreover, CPD patrol officer, Malcolm Sutton-Nicholson ("Officer Sutton-Nicholson") testified that he was engaged in secondary employment, as a security officer, at the nightclub on December 31, 2019. Officer Sutton-Nicholson explained that he is generally stationed outside the venue. At trial, Officer Sutton-Nicholson was shown camera three from the video, the segment depicting the patrons entering the nightclub. Officer Sutton-Nicholson was able to confirm his presence on the footage and explained that he had momentarily stepped inside the nightclub. Officer Sutton-Nicholson's testimony served as further authentication of the video admitted into evidence.

{¶ 43} Based on the foregoing, we find the state satisfied Evid.R. 901(A), and we find no merit to Heard's argument that the state failed to properly authenticate the surveillance video footage.

{¶ 44} Accordingly, we overrule the second assignment of error.

**Reopening Case**

{¶ 45} In the third assignment of error, Heard argues the trial court abused its discretion and violated his constitutional rights against double jeopardy by reopening the case after rendering its verdict on the matters not tried to the jury.

{¶ 46} The decision whether to reopen a case for the presentation of further testimony is within the discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *State v. Watson*, 8th Dist. Cuyahoga No. 70344, 1997 Ohio App. LEXIS 1110 (Mar. 20, 1997), ¶ 10, *Columbus v. Grant*, 1 Ohio App.3d 96, 97, 439 N.E.2d 907 (10th Dist.1981). An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 47} In this matter, as previously stated, Heard elected to have the charges of having weapons while under disability and the repeat violent offender specification, as well as the 54-months firearm specification attached to Counts 1-9, tried to the bench. On May 3, 2021, immediately after the trial court announced the jury's verdict, the trial court announced that it had found Heard guilty of the charges and specifications attached to the respective counts.

{¶ 48} On May 12, 2021, the trial court reconvened and indicated that at the time it announced the verdict on the bifurcated matters, it was laboring under the misimpression that the parties had stipulated to those charges. The trial court subsequently reopened the case, to which the defense counsel objected. The trial court overruled the objection and allowed the state to present the testimony of Detective Steven Veverka ("Detective Veverka") of the Cuyahoga County Sheriff's Office.

{¶ 49} Detective Ververka proceeded to testify that he compared Heard's jail booking fingerprint card for the instant case with the card from the previous case and concluded that both originated from Heard. The parties then stipulated that both fingerprint cards belonged to Heard. The trial court admitted both fingerprint cards into evidence and found Heard guilty of the charges.

{¶ 50} Heard now claims that the trial court violated his constitutional rights against double jeopardy. We find no merit in this assertion.

{¶ 51} On a prefatory note, the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." This protection applies to Ohio citizens through the Fourteenth Amendment to the United States Constitution. *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, ¶ 10, citing *Benton v. Maryland*, 395 U.S. 784, 786, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Similarly, the Ohio Constitution provides: "No person shall be twice put in jeopardy for the same offense." Ohio Constitution, Article I, Section 10. The protections afforded by the double jeopardy clauses of the Ohio and United States Constitutions are "coextensive." *State v. Mutter*, 150 Ohio St.3d 429, 2017-Ohio-2928, 82 N.E.3d 1141, ¶ 15, citing *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250 (2002), ¶ 7.

{¶ 52} Further, the prohibition against the double jeopardy clause "protects against three abuses": (1) "'a second prosecution for the same offense after acquittal,'" (2) "'a second prosecution for the same offense after conviction'" and (3)

"'multiple punishments for the same offense.'" *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10, quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).

{¶ 53} Here, we find none of these delineated "abuses" is implicated in this case. Heard had not been acquitted, was not being prosecuted a second time for the same offenses, and the trial court had not meted out multiple punishments. The trial court had simply labored under the misimpression that there was a stipulation and rectified the matter by reopening the case to reconcile the record. Importantly, Heard has not demonstrated any prejudice. As such, we find no abuse of discretion in the trial court's decision.

{¶ 54} Accordingly, we overrule the third assignment of error.

**Sufficiency of Evidence**

{¶ 55} In the fourth assignment of error, Heard argues the trial court erred when it denied his Crim.R. 29 motion for acquittal because the state failed to present sufficient evidence to sustain the convictions.

{¶ 56} Preliminarily, we note, Crim.R. 29(A) provides that a court

> shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses. Because a Crim.R. 29 motion questions the sufficiency of the evidence, [w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.

*State v. Scott*, 8th Dist. Cuyahoga No. 110691, 2022-Ohio-1669, ¶ 36, citing *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 57} A sufficiency challenge requires a court to determine whether the state has met its burden of production at trial and to consider not the credibility of the evidence but whether, if credible, the evidence presented would sustain a conviction. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 58} In this matter, the jury found Heard guilty of two counts of felonious assault, which required the state to prove that he knowingly caused or attempted to cause physical harm to another by means of a deadly weapon or dangerous ordnance in the form of a firearm.

{¶ 59} As previously stated, the shooting was captured on the nightclub's surveillance video footage, which we have concluded was properly authenticated and duly admitted into evidence. The segment, captured by camera three, depicted patrons, including Heard, entering the nightclub. Heard's face is clearly visible and the green sweatshirt, with the distinctive ornamental large "X" adorning the back of the garment, as well as the embellishments on the sleeve, are evident. In the three

other segments, captured by cameras five, six, and eight, depicting the shooting from different angles, the shooter was wearing the sweatshirt described above. Detective Berry testified that he saw no one else on the surveillance footage with the same distinctive patterns featured on the sweatshirt that Heard was wearing. The surveillance video unmistakably linked Heard to the gunshot wounds Dukes sustained that night.

{¶ 60} Viewing this evidence in the light most favorable to the state, any rational trier of fact could have found that the state presented sufficient evidence to satisfy the elements of felonious assault as charged. Consequently, the trial court properly denied Heard's Crim.R. 29 motion for acquittal.

{¶ 61} Accordingly, we overrule the fourth assignment of error.

**Manifest Weight of Evidence**

{¶ 62} In the fifth assignment of error, Heard argues his convictions were against the manifest weight of the evidence.

{¶ 63} Unlike sufficiency, "'weight of the evidence involves the inclination of the greater amount of credible evidence.'" *State v. Harris*, 8th Dist. Cuyahoga No. 109060, 2021-Ohio-856, ¶ 32, quoting *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Weight of the evidence relates to "'the evidence's effect of inducing belief.'" *Id.*, quoting *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. The reviewing court must consider all of the evidence in the record, the reasonable inferences to make from it, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the

factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id.*, citing *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 64} Initially, we note Heard devotes much of his argument to the impact of Farrell's testimony. However, as discussed in the first assignment of error, the jury acquitted Heard of the charges where Farrell's testimony would have been relevant. Thus, having previously found any issues flowing from Farrell's testimony to be moot, her testimony will not be a factor in our analysis herein.

{¶ 65} Here, as discussed in the preceding assignment of error, the surveillance video footage unquestionably revealed that Heard was the individual that was shooting inside the nightclub. As previously discussed, but worth repeating, the surveillance cameras captured Heard entering the nightclub in very distinctive clothing and later caught him shooting into the crowd of revelers. The surveillance video persuasively supports the state's claim that Heard was the individual that was shooting inside the nightclub.

{¶ 66} Nothing in our review indicates that the jury clearly lost its way and created a manifest miscarriage of justice in finding Heard guilty.

{¶ 67} Accordingly, we overrule the fifth assignment of error.

**Prosecutorial Misconduct**

{¶ 68} In the sixth assignment of error, Heard argues he was denied a fair trial when the trial court overruled his objection to the prosecutor's improper statements during closing argument.

**{¶ 69}** At the outset, it is important to note that the relevant question in reviewing a claim of prosecutorial misconduct is "'"whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process."'" *State v. Froman,* 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 114, quoting *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

**{¶ 70}** In answering that question, the reviewing court considers "whether the conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights." *Id.*, citing *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243. In evaluating prejudice, the court considers "the effect that the misconduct had 'on the jury in the context of the entire trial.'" *Id.*, quoting *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

**{¶ 71}** In this matter, during closing argument, the prosecutor stated:

> But you'll see that he [Mr. Heard] knows these security guards, and I think this is important, because from Mr. McIntosh's testimony, we know that there were 30 security guards in the club that night, and at least those two at the front door know this man and they know who he is [meaning Mr. Heard.]
>
> * * *
>
> And this is what you need to be thinking about. They know what he's capable of. The idea that those security guards didn't want to come here, didn't want to talk to the detectives, it's either because they're afraid of him, or because they know him and they're sticking up for him. They won't snitch.

{¶ 72} Heard now argues the above statements were improper because they violated, among other things, his rights to confrontation, since no security guards testified at the trial. However, despite Heard's present assertions about the impact of the above statements, the record reveals that the statements he deemed improper bore some relationship to testimony presented at trial.

{¶ 73} Relevantly, the following exchange took place between McIntosh and the prosecuting attorney:

Q. And I've asked you who the security guards are?

A. Yes.

Q. And you have not provided me the names of the security guards —

A. No.

Q. — right?

A. Yes.

Q. Why is that?

A. They aggressively told me that they did not want to be involved and were scared.

{¶ 74} Here, the above exchange ostensibly provided the basis for the prosecutor's comments during closing arguments. It is important to keep in mind that a prosecutor has wide latitude to comment on the evidence of record and may suggest conclusions based on that evidence in a closing argument. *Chagrin Falls v. Ptak*, 8th Dist. Cuyahoga No. 109342, 2020-Ohio-5623, ¶ 54, citing *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 111.

{¶ 75} Thus, a prosecutor may freely address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Wuensch*, 8th Dist. Cuyahoga No. 105302, 2017-Ohio-9272, ¶ 38, citing *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990); *State v. Black*, 181 Ohio App.3d 821, 2009-Ohio-1629, 911 N.E.2d 309, ¶ 33 (2d Dist.). Because the prosecutor was arguably drawing an inference from McIntosh's testimony, it was permissible. These comments did not serve to infect the trial with unfairness to make the resulting conviction a denial of due process. As such, we find Heard's present assertion not well-taken.

{¶ 76} Accordingly, we overrule the sixth assignment of error.

**Reagan Tokes Act**

{¶ 77} In the seventh assignment of error, Heard argues that his indefinite sentence imposed pursuant to the Reagan Tokes Act is unconstitutional because it violates the right to trial by jury, the separation-of-powers doctrine, and the right to due process.

{¶ 78} However, we need not dwell on the arguments presented. The Ohio Supreme Court held in *State v. Maddox,* Slip Opinion No. 2022-Ohio-764, that constitutional challenges to the Reagan Tokes Act are ripe for review. Based on the authority established by this district's en banc holding in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.), the challenges Heard advanced against the constitutional validity of the Reagan Tokes Act have been overruled. *Id*. at ¶ 17-54.

{¶ 79} Accordingly, we overrule the seventh assignment of error.

**Effective Assistance of Counsel**

{¶ 80} In the eighth assignment of error, Heard argues defense counsel was ineffective for failing to object to the imposition of an indefinite sentence under the Reagan Tokes Act. However, given our resolution of the seventh assignment of error, overruling Heard's constitutional challenges to the Reagan Tokes Act, his assertion is now rendered moot.

{¶ 81} Accordingly, we summarily overrule the eighth assignment of error,

{¶ 82} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

SEAN C. GALLAGHER, A.J., and
MARY EILEEN KILBANE, J., CONCUR

N.B. Judge Emanuella D. Groves concurred with the opinions of Judge Lisa B. Forbes (dissenting) and Judge Anita Laster Mays (concurring in part and dissenting in part) in *Delvallie* and would have found the Reagan Tokes Law unconstitutional.

Judge Mary Eileen Kilbane joined the dissenting opinion by Judge Lisa B. Forbes and the concurring in part and dissenting in part opinion by Judge Anita Laster Mays in *Delvallie* and would have found the Reagan Tokes Law unconstitutional.